**The STATE of Texas, Appellant,**

v.

**Jorge Elias KURI, Appellee.**

**No. C14–91–00432–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 7, 1993.

Dissenting Opinion of Justice Sears
Jan. 14, 1993.

460

Lester Blizzard, Houston, for appellant.

Jack B. Zimmermann, Jim Lavine, Houston, for appellee.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

This is an appeal by the state from a dismissal for lack of a speedy trial. Appellee, an attorney, was indicted for the offense of delivery of a controlled substance, cocaine. The Honorable Norman Lanford granted Appellee's Motion to Dismiss for Lack of a Speedy Trial, holding that appellee was denied a speedy trial in violation of the U.S. and Texas Constitutions. The state in three points of error contends Judge Lanford erred by failing to properly apply the constitutional standards for a speedy trial to the facts of this case. We reverse and remand.

The right to a speedy trial is guaranteed by the Sixth Amendment of the U.S. Constitution as applied to the states through the Fourteenth Amendment. U.S. Const. amend. VI; *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Texas Constitution also guarantees the accused in all criminal prosecutions the right to a speedy public trial. Tex. Const. art. I, sec. 10. Although the Texas and federal constitutional rights to a speedy trial are separate and distinct, the federal courts' interpretation and application of this Sixth Amendment right has served as a useful guide for the Texas courts in interpreting our state constitutional right to a speedy trial. *Chapman v. Evans*, 744 S.W.2d 133, 135 (Tex.Crim.App.1988); *Hull v. State*, 699 S.W.2d 220 (Tex.Crim.App.1985). In *Barker v. Wingo*, the United States Supreme Court adopted a four-part "balancing test" to determine whether an accused has been denied the right to a speedy trial under the Sixth Amendment. The factors to be considered in each case are: (1) the length of delay; (2) the reason for the delay; (3) the accused's assertion of the right; and (4) the prejudice to the accused resulting from the delay. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192; *Chapman*, 744 S.W.2d at 136. These factors are applied on an *ad hoc* basis as a balancing test in which the conduct of the prosecution and the defendant are weighed. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192; *Thompson v. State*, 804 S.W.2d 577 (Tex.App.—Houston [14th Dist.] 1991, no pet.).

A brief procedural history of this case reflects that appellee was indicted on August 19, 1988, and charged with delivery and possession of cocaine weighing at least

400 grams. On June 20, 1989, the case was dismissed on the state's motion following the trial court's denial of the state's motion for a two-day continuance. Approximately one year later, on June 22, 1990, appellee was again indicted and charged only with the offense of delivery of cocaine which arose out of the same transaction as the initial indictment. The parties agreed to a setting of the case for trial on April 22, 1991. On April 23, 1991, Judge Lanford granted appellee's Motion to Dismiss for Lack of Speedy Trial. Other relevant facts and procedural details of the case will be provided in the remainder of this opinion as the issues are discussed.

The delicate balancing process set out in *Barker v. Wingo* mandates that the trial court, and we, as an appellate court, consider the conduct of both the state and the defendant in determining the speedy trial issue. No one factor of the four set out in *Barker* is sufficient or necessary to determine a speedy trial violation. Rather, they are related and must be considered together along with other factors to assist us as we carry out the delicate balancing process. *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193. To facilitate discussion and for clarity, we have separated the four factors in this opinion, but they are interrelated and will be examined in that context.

## LENGTH OF DELAY

■ Length of delay alone is not the measure. The right to a speedy trial cannot be quantified into a specific number of days or months. *Id.* at 521–522, 92 S.Ct. at 2187–2188. Thus no specific length of delay automatically constitutes a violation of the right to a speedy trial. *Hull*, 699 S.W.2d at 221; *Easley v. State*, 564 S.W.2d 742, 744 (Tex.Crim.App.1978), *cert. denied*, 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978); *Chapman*, 744 S.W.2d at 136. In *Barker*, five years had passed, and the Supreme Court acknowledged that this was too long, but found against the defendant because there were counterbalancing factors. *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193. One of these factors in *Barker* was the defendant's failure to assert the right, as evidenced by his acquiescence in various

continuances. However, length of delay is to some degree a triggering mechanism. Until some delay results which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. *Id.* at 530, 92 S.Ct. at 2192. Since appellee has asserted and the trial court found actual prejudice, we must make the inquiry into the other factors. However, we must consider the length of delay only in conjunction with the other factors and circumstances. First, we must determine by the balancing process what the relevant length of delay is in this case.

The trial court largely hinged its speedy trial determination on its conclusion that there was a 32–month length of delay in this case. Appellee and the trial court arrived at this total by including three separate time periods. The first is a ten-month period from the initial indictment on August 19, 1988, to June 20, 1989, when it was dismissed on the state's motion. The second is a 12–month period from the dismissal date until June 22, 1990, during which time appellee was not under any indictment. The third is a ten-month period from June 22, 1990, the date of the second indictment, to April 23, 1991, when Judge Lanford granted appellee's Motion to Dismiss for Lack of Speedy Trial.

The record reveals that the initial ten-month period of delay which the trial court included was primarily brought about by the parties' agreed resets. From the date of the original indictment, August 19, 1988, until its dismissal on June 20, 1989, the appellee agreed to no less than eight resets. In the next-to-last reset, the parties had agreed to a trial setting of May 19, 1989. Appellee asked the state if it would agree to a later reset because Judge Lanford would be attending a judicial seminar on that date and appellee did not want to try the case before a visiting judge. The state agreed to reset it to June 19, 1989, which turned out to be the last setting. Prior to this setting, the state prosecutor asked for a reset because a state's witness was unavailable. Appellee's counsel refused and the state filed its first Motion for Continuance on June 14. Appellee vigor-

ously opposed this motion. The record is unclear when the court denied the motion. The court's finding of fact states that it was denied on June 14, however, the statement of facts relating to the hearing indicates that the court carried the matter over to June 20, 1989, without any objection from appellee. In the interim, on June 16, the state filed its second Motion for Continuance, because another essential witness would be unavailable to testify until later that week. The state requested only a two-day continuance. Appellee vigorously opposed even this minimal continuance. Judge Lanford asked the parties if they would be able to try the case later in the week, or during the following week. Appellee's counsel responded that he very much opposed the motion. Judge Lanford at first granted the state's Motion for Continuance and set the case for trial the following Monday. The court then heard further argument by appellee's counsel and stated:

> "I hate to appear wishy-washy, but I have reconsidered this. I am going to deny the Motion for a Continuance. I think the State ought to go. Please be back at 1:30 this afternoon."

The state was forced later that same day to file a Motion to Dismiss the Indictment, which the trial court granted.

■ Our review of the record persuades us that the trial court erred in including this initial ten-month period for speedy trial purposes. In our opinion, the trial court did not apply the proper balancing test because it did not consider the conduct of the defendant as required by *Barker*. This initial period of delay was almost exclusively brought about by resets agreed to by the appellee. We have previously held that the time covered by a defendant's agreed resets is to be excluded from speedy trial consideration. *Caicedo v. State*, 769 S.W.2d 597, 598 (Tex.App.—Houston [14th Dist.] 1989, no pet.); *Lewis v. State*, 686 S.W.2d 243 (Tex.App.—Houston [14th Dist.] 1985), *aff'd*, 711 S.W.2d 41 (Tex.Crim. App.1986). We firmly believe that a defendant's agreement to various resets is inconsistent with assertion of a speedy trial right, and the delay covered by such resets should not be included in speedy trial computations. There is no question that the defendant's conduct in agreeing to resets is a factor to be considered in the balancing process enunciated in *Barker*. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192.

■ The second period of delay included by the court in its speedy trial determination ran from the dismissal of the first indictment to June 22, 1990, when the second indictment was voted by the grand jury. This was a period of approximately twelve months. We find this time period should also be excluded from the speedy trial computation. There can be no speedy trial guarantee when there are no formal charges pending, unless the person is being restrained in some way. The right attaches only when a person is formally "accused," which occurred here with the second indictment. *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971); *Courtney v. State*, 472 S.W.2d 151, 153 (Tex.Crim.App.1971). And once charges are formally dismissed as here, a speedy trial guarantee is no longer applicable because a citizen no longer suffers restraints on his liberty. *United States v. MacDonald*, 456 U.S. 1, 8–9, 102 S.Ct. 1497, 1502–1503, 71 L.Ed.2d 696 (1982); *Stewart v. State*, 767 S.W.2d 455 (Tex.App.—Dallas 1988, pet. ref'd).

The speedy trial guarantee under the Sixth Amendment is directed at minimizing the possibility of lengthy incarceration before trial, reducing the liberty restraints of being out on bail, and shortening the disruption of life which results from pending criminal charges. *MacDonald*, 456 U.S. at 7, 102 S.Ct. at 1501. Once appellee's indictment was dismissed, he was free and under no restraint. No formal adversarial action by the state was pending against him. He was free to tend to his affairs, practice his profession, and go on with his life. He was in no different position than any other citizen who might be the subject of a criminal investigation. *Id.* at 11, 102 S.Ct. at 1503. This lack of restraint distinguishes this case from the *Owens* case relied on by appellee to support the inclusion of this preindictment time period in the speedy

trial analysis. *State v. Owens,* 778 S.W.2d 135 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd.). In *Owens,* the accused was jailed for 223 days before indictment. Clearly, the state had restrained the accused's liberty in *Owens.* When the state continued to hold Owens for the better part of a year without an indictment, it activated the protections of the Sixth Amendment's speedy trial provision. *Marion,* 404 U.S. at 320, 92 S.Ct. at 463. The conclusion is clear: an individual must be formally charged, or jailed, or restrained in some manner to implicate the speedy trial provision of the Sixth Amendment. *Id.*

In regard to this preindictment time period, the trial court made a conclusion of law that the state should have reindicted the appellee immediately after dismissal of the first indictment if the case had merit. In our opinion, this falls somewhat short as a conclusion of law. It is more in the nature of the judge's opinion as to what the district attorney should do in carrying out his official responsibilities. It is uniquely the discretionary function of the district attorney to decide when and if he has sufficient evidence to seek a new indictment. Courts are not constitutionally permitted under the due process clause to abort criminal prosecutions because they disagree with the prosecutors' decisions as to when to seek an indictment. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). Nor should they be allowed to do so by retroactive analysis under the speedy trial guarantee. Prosecutors are under no duty to file charges before they are satisfied that they will be able to establish the defendant's guilt beyond a reasonable doubt. *Id.* at 790, 97 S.Ct. at 2049. There is no Sixth Amendment right to a speedy indictment. *MacDonald* 456 U.S. at 8, 102 S.Ct. at 1502; *United States v. Delario,* 912 F.2d 766, 769 (5th Cir.1990).

We find the trial court's conclusion of law to be in error, and that he erred by including the preindictment period in his speedy trial analysis. We will, however, discuss this time period later under the due process clause of the Fifth Amendment of the U.S. Constitution.

■ Thus, for speedy trial purposes, there remains only the ten-month period from June 22, 1990, the date of the second indictment, to April 23, 1991, when Judge Lanford granted the speedy trial motion to dismiss. This period of time affords very little support for a violation of appellee's speedy trial guarantee. The record reflects that the only trial setting was an agreed setting for April 22, 1991, which was filed on November 26, 1990. Before that agreed setting, appellee made no motion for a speedy trial. In fact the only motion relevant to a speedy trial was his Motion to Dismiss for Lack of a Speedy Trial and that was filed on November 16, 1990. Apparently, he was interested not in a speedy trial, but only in a dismissal, and was counting on the trial court to include the time during and after the first indictment in its speedy trial analysis. Without such an improper stacking of the prior time periods, the appellee cannot seriously claim that he was denied a speedy trial during this final ten-month period. He not only did not ask for a speedy trial during the first five months of this period, but he acquiesced in whatever further delay occurred by agreeing to the only trial setting some five months later on April 22, 1991. Clearly, he neither asserted his constitutional speedy trial guarantee, nor was it violated during this time period.

## REASON FOR THE DELAY

Our discussion of the length of delay largely subsumes this balancing factor. There is no real development in the record as to the reason for the initial ten-month delay, other than to inform us that the state and appellee agreed to resets which consumed most of the ten months. Inasmuch as this first period of time was agreed to by appellee except for the two-day continuance request by the state, the reason for the delay is unknown and really immaterial. Surely, the appellee, represented as he was by competent and experienced counsel, would not agree to resets that were not in his best interest. The

same logic applies to the third period of time.

As to the second period of time, we have held it to be excluded from constitutional speedy trial analysis because there was no formal accusation pending against appellee, nor was he under any restraint. Since it was not includable, a discussion of the reasons for the delay under a speedy trial analysis would be irrelevant. We will reserve any such discussion for our later analysis under the due process clause of the Fifth Amendment.

## ASSERTION OF THE RIGHT

■ Again, because of our prior reasoning under the length of delay analysis, this issue is largely moot except, to some extent, for the initial ten-month period of time after the first indictment. Clearly, the subsequent intervening, preindictment period of time is moot, because as appellee expresses in his brief, there can be no assertion of a speedy trial right when there is no formal charge pending. Likewise the third time period is excluded from this discussion because the appellee made no motion for a speedy trial, and in fact, agreed to the one trial setting that covered the bulk of the time from indictment. By his speedy trial dismissal motion, which the court granted, he presumed that the two prior time periods would be included. In no way could his motion for dismissal be considered a retroactive request for a speedy trial. In fact, such motions by a defendant for dismissal, rather than for a speedy trial, are clearly relevant and may weaken the strength of his asserted claim for a speedy trial. *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim.App. [Panel Op.] 1983) (citing *McCarty v. State*, 498 S.W.2d 212, 215–16 (Tex. Crim.App.1973)); *Crowder v. State*, 812 S.W.2d 63, 67 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd).

Thus, we are left to determine whether the appellee asserted his speedy trial right during the initial ten-month period from the time of the first indictment until the state moved for a dismissal following the denial of its motion for a two-day continuance. Retroactively, appellee by implication alleges that he originally asserted his speedy trial right when he opposed the state's motion for a continuance of two days during this original time period. However, we find no written motion for a speedy trial in the record. Nor did appellee's counsel mention at the hearing on the state's motion for continuance that he had previously asserted his speedy trial rights. Indeed, with the eight prior agreed resets, he would have been hard pressed to do so. The words "speedy trial" appear no where in the record of the hearing on the motion for continuance. In view of the numerous agreed resets, it would appear that the appellee's opposition to the state's Motions for Continuance were more of a tactical move directed at seeking a dismissal, rather than a speedy trial.

The sequence of events and the argument of appellee's counsel support the tactical conclusion and militate against any speedy trial motivation on appellee's part. At the time of the hearings on the state's motions for continuance, the case was ten months old. Appellee's counsel, during the continuance hearing, made the argument that the matter had been hanging over the appellee's head for nine months. However, he failed to mention that during those nine months he made no motions for a speedy trial, and expressed no concern about a speedy trial. Instead, he agreed to eight resets, and specifically asked the state to reset the next to last setting because he did not want to try the case before a visiting judge. Obviously, obtaining a speedy trial was not his primary consideration.

Appellee's desire for an immediate trial apparently arose when the state requested its first continuances because of temporarily unavailable witnesses. The state's prosecutor testified that prior to the time he informed appellee's counsel that he was going to file a motion for continuance, there had been no request or suggestion of speedy trial concerns by appellee. Also, in spite of the state's prior cooperation in agreeing to the last reset requested by the appellee to avoid a visiting judge, appellee vigorously opposed the motions for continuance filed by the state. His opposition

was so strong that he opposed even a two-day or one-week reset suggested by the trial judge. Thus, appellee's sudden desire for "speedier" trial would appear to be motivated by the position of tactical disadvantage in which he found the state. After having agreed to resets as outlined for nine months, appellee found he could not tolerate even a delay of two more days.

In applying the balancing test of *Barker*, we must look to the conduct of the appellee to determine whether he in good faith asserted his right to a speedy trial. After reviewing the record, we find the agreed numerous resets, the timing of his opposition to a continuance, the argument made by his counsel during the hearing, and his opposition to even a two-day reset, do not support the trial court's finding that he asserted his right to a speedy trial. At the time of the initial hearing on the motion for continuance, and later at the speedy trial dismissal hearing, appellee asserted that the state had no real case against appellee and was simply stalling for time. If the appellee truly believed that, then why did he not agree to the two-day reset suggested by the judge and bring this matter to trial, so the allegedly weak case of the state could be exposed and defeated? Again, dismissal, and not a speedy trial, appears to have been appellee's goal. In our adversarial advocacy system, such tactical moves are proper and expected. However, when the purpose of such actions are asserted as a basis for aborting a public trial on speedy trial grounds, we, as a reviewing court, must examine the record to determine their true purpose.

Based on our review of the record, we find the trial court erred by failing to consider and balance the conduct of the appellee as required by *Barker* for speedy trial analysis, and thus abused his discretion in finding that appellee asserted his speedy trial rights in June, 1989 by simply opposing the state's limited motion for continuance.

## PREJUDICE TO THE APPELLEE

■ Continuing our balancing process, we now address the fourth prong of the *Barker* standards: The prejudice, if any, to the appellee. There are three interests to be considered when determining prejudice to the defendant. These are: (1) to prevent oppressive pre-trial incarceration, as occurred in *Owens, supra;* (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. For speedy trial purposes, proof of actual prejudice is not required. Appellee must only make "some showing" that the delay has been prejudicial. *Phillips*, 650 S.W.2d at 402–03. As indicated in our previous discussion, the first two are not implicated here.

To show prejudice to appellee's defense, he presented Gene Boyd, a private investigator employed by his counsel since 1984. Boyd testified that a potential witness, Mary Karen Koonce, had accidentally drowned in December, 1989, six months after the dismissal of the first indictment. He testified that she was a potential client and then a former client and he had spoken to her twice on the telephone and was trying to make arrangements to meet with her. He did not complete a thorough interview with her at anytime during the ten months that the first indictment was pending. He said she was a reluctant witness, but admitted that she had not been subpoenaed during the last three trial settings in March, May, and June of 1989. He testified that he "learned that she had information regarding the location of appellee on August 18, 1988," the day alleged in the indictment. In preparation for the current trial date of April 20, 1991, he attempted to locate her and only then learned of her death. Finally, we note that her accidental drowning occurred six months after the indictment was dismissed, which dismissal was brought about by the appellee's unwillingness to accept a two-day trial delay as previously outlined. Boyd apparently had no further contact with her during the six months preceding her death.

Boyd also testified that he had contacted at some time in the past, presumably during 1988, the time of the first indictment, a potential witness, Korina Zuniga, a former

secretary of appellee. He testified that he had interviewed her and submitted a report, and that she had knowledge about the location or whereabouts of appellee on August 18, 1988. He testified that she was no longer at her original address, and that he had taken certain steps to locate her. He stated he had searched county records, had a driver's license search and a social security number search. He was asked if any of these attempts revealed a correct address and responded rather open-endedly, "Not to this point." And he stated that she had information that "could be material" in determining appellee's location at given times during the day of the alleged offense. He also testified that he had not exhausted every means of finding the witness. In response to cross-examination, he stated that he had submitted to appellee's counsel a report about what the witness had to say about the appellee's activities on the alleged offense date. The state asked for a copy of the report. Appellee's counsel quickly objected on the grounds that it was not discoverable under the work-product privilege. He made no offer to submit it to the judge for his consideration in determining the materiality of the concerned witness's testimony. Boyd testified that he believed the secretary had left the employ of appellee during the preceding year and that he learned after the fact that she left appellee's employ. He admitted that appellee would have known when she left his law firm's employ. He also admitted that he did not take a formal written statement from her.

In our opinion the evidence presented is not sufficient to show that the witnesses' testimony was material and its absence therefore prejudicial. As to the deceased witness, he testified that she was a reluctant witness, yet no subpoenas were issued for her during any of the trial settings under the first indictment. He took no formal statement from her. He did not testify that she would testify favorably or provide an alibi for appellee as to the day of the alleged offense. Presumably he knew what her testimony would have been, yet he did not give that information to the judge; rather he carefully hedged his statements about her testimony.

Similarly, he hedged his testimony as to what the missing former secretary of the appellee would testify to concerning appellee's whereabouts on the date of the offense. In her case, he made a written report, but counsel for appellee refused to produce it either for the state or for the judge. He admitted he had not exhausted all sources for determining her address. He also did not specifically state that all the sources he had utilized had responded negatively. He repeatedly used the phrase "Not up to this point." He stated that she had left appellee's employ the preceding year and that the appellee would have knowledge as to when she left. He made no explanation as to why he, defense counsel, or the appellee would not have maintained contact with such a witness if she was important to appellee's defense to the charges which had been pending against him since June of the year in which she apparently left his employ. Nowhere in his testimony did he state that either of these witnesses would have testified favorably to appellee. In spite of these facts, the trial judge found that the appellee suffered actual prejudice. We find the trial judge erred or abused his discretion in making such a finding on the glaringly weak evidence before him.

█ We acknowledge that the standard in Texas to show prejudice for speedy trial purposes, however, is not actual prejudice but some showing of potential prejudice resulting from the delay. *Chapman*, 744 S.W.2d at 137. Even so, we find that there was not sufficient evidence produced to show prejudice to the defense for speedy trial purposes. However, even if the evidence is sufficient to show some prejudice and thereby satisfy the speedy trial requirement, we still find no violation of appellee's constitutional speedy trial rights because as stated, no single factor in the balancing process is sufficient to warrant a finding of deprivation of the right to a speedy trial. *Barker, supra; Chapman, supra.* We conclude, after engaging in the delicate balancing process required, that no

presumptively prejudicial delay resulted; that the appellee acquiesced in the delay claimed; and he failed to timely assert a speedy trial right. We find that these factors, and the others discussed, counterbalance and outweigh the minimal showing of unarticulated potential prejudice. The trial judge erred in dismissing this cause on speedy trial grounds because he failed to apply and balance the proper constitutional standard.

 While it is clear from the statement of facts that appellee's primary claim and the trial court's decision were based on the alleged violation of his right to a speedy trial, appellee also made reference to the Fifth Amendment in his Motion to Dismiss for Lack of Speedy Trial. And the court in its Conclusion of Law No. 1, found that the pre-trial delay also violated appellee's rights under the Fifth Amendment to the U.S. Constitution and under Article 1, Section 19 of the Texas Constitution. The state, in its fourth point of error, conceded that the court based its ruling in part upon the Due Process Clause of the Fifth Amendment and the Due Course of Law Provision of the Texas Constitution. We now address whether the preindictment period of twelve months violated appellee's rights under these constitutional provisions.

The primary guarantee against bringing overly stale criminal charges is provided by the time limitations imposed by law in statutes of limitations, but the Due Process Clause of the Fifth Amendment also has a limited role to play in protecting against oppressive delay that may prejudice an accused's right to a fair trial. *Marion*, 404 U.S. at 324–326, 92 S.Ct. at 465–466. Claims of due process violation because of preindictment delay are evaluated by a different and more onerous standard than alleged speedy trial violations. The Due Process Clause of the Fifth Amendment requires dismissal for pre-indictment delay only if the appellee can show that the delay caused (1) substantial prejudice to his right to a fair trial, and (2) the delay was an intentional device by the state to gain a tactical advantage over the accused. *Id.* at 325, 92 S.Ct. at 466. In our previous detailed discussion concerning the question of prejudice for speedy trial purposes, we found that there was not sufficient evidence of prejudice shown to justify even the minimal showing required to invoke that constitutional right. It follows then that the same evidence, in our opinion, fails to satisfy the more onerous burden of showing substantial prejudice as required by the due process clause to justify dismissal for preindictment delay. *Id.* 404 U.S. at 325, 92 S.Ct. at 466; *Spence v. State*, 795 S.W.2d 743, 749 (Tex.Crim.App. 1990).

In *Lovasco*, the Supreme Court found that an 18–month preindictment delay did not violate the due process clause even though the defendant was somewhat prejudiced because two material witnesses died during this interim. *Lovasco*, 431 U.S. at 786, 97 S.Ct. at 2046. One of the deceased witnesses had been the source for the guns which were the subject of the firearms violations alleged in the indictment against *Lovasco*. The other witness was allegedly present when *Lovasco* contacted this deceased source witness to secure the guns. *Id.* As if to emphasize the more onerous standard of prejudice required in due process preindictment delay, the court in *Lovasco* specifically pointed out that *Lovasco* "did not state how the witnesses would have aided the defense had they been willing to testify." *Id.* Nor in the case before us, did appellee present any specific evidence as to how the missing witnesses would have aided his defense. In fact, appellee's counsel objected to furnishing the private investigator's report as to the possible testimony of one of the missing witness. If that testimony had been favorable to appellee, surely the report would have been furnished to the trial judge to show any actual or substantial prejudice resulting from its loss. The trial court's finding of actual prejudice is simply not supported by the evidence, and the evidence of alleged prejudice that was presented does not rise to the level of prejudice required to show a due process violation under the Fifth Amendment. *Marion*, 404 U.S. at 325, 92 S.Ct. at 466.

■ Even if appellee had met his burden to show sufficient prejudice to implicate a due process inquiry, his burden does not stop there. He must also show that the preindictment delay was an intentional device to gain tactical advantage over him. There is no evidence that the state sought to gain a tactical advantage over the defendant by the preindictment delay. The trial court made a conclusion of law that the delay was intentionally caused by one departing prosecutor who made a conscious decision not to prosecute. This conclusion by the court is more in the nature of a fact finding, but regardless of its label, it is not sufficient to establish that the preindictment delay time was a "device to gain tactical advantage over the accused."

The evidence does show that a former prosecutor who was initially assigned to the case had a conflict with his supervisor as to whether an indictment should be sought. He concluded that it should not be, because he did not believe he had enough evidence to secure a conviction at the time he resigned in January 1990. He testified he did not seek a no bill, nor did he close the file, because he felt like he had been given a directive by his supervisor that there was sufficient evidence to seek a new indictment and prosecute the case. He testified that he did not explore every possible evidentiary avenue in the case and that he and other prosecutors occasionally differed as to whether to go forward with a case. He also testified that he was not aware of additional and new evidence later obtained by a subsequent prosecutor, who sought and obtained a new indictment against appellee after he had left. He also testified that he conveyed to his immediate successor that he thought the case should not be presented to the grand jury. But he also admitted that the ultimate decision as to whether to seek a new indictment on appellee's case was to be made by his successor. He also testified that after he had left the district attorney's office and had no further authority over the case, he informed appellee's counsel of his opinion. At this time he also advised appellee's counsel that his immediate successor in the district attorney's office agreed with his assessment of the case and that, in his opinion, appellee was not going to be reindicted. However, he further testified that he never promised appellee's attorneys that appellee would never be indicted or prosecuted within the applicable statute of limitations period without regard to any additional evidence that might be uncovered after he left.

Appellee seizes on this evidence by a former prosecutor to claim a constitutional violation of his Fifth Amendment due process rights because the state did not reindict him sooner. The trial court agreed with appellee's position and legally concluded that if the case had merit, the state should have immediately reindicted appellee after the first indictment was dismissed. This in spite of the fact that the state's dismissal of the first indictment was brought about by the court's agreement with the appellee's vigorous opposition to the state's motion for a two-day continuance, which the trial court overruled. Had the motion been granted and the case tried two days later, the merits of the state's case could have been finally determined. However, it was not, and the trial court summarily terminated the state's new indictment on constitutional grounds because it was not filed quickly enough.

As stated, the trial court's so-called conclusion of law as to the state's indictment timetable is more in the nature of the judge's opinion as to what the district attorney should do in carrying out his official responsibilities. We reiterate that it is the responsibility of the district attorney, as the state's representative, to decide when, and if, there is sufficient evidence to seek a new indictment. Trial courts are not permitted under the due process clause to abort criminal prosecutions simply because they disagree with the prosecutors' decisions as to when to seek an indictment. *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049. Prosecutors are under no duty to file charges before they are satisfied that they will be able to establish the defendant's guilt beyond a reasonable doubt. *Id.* at 790, 97 S.Ct. at 2048. And to impose such a duty would have a deleterious effect both

upon the rights of the accused and upon the ability of the public to protect itself. *Id.* There is no judicial power to order, or a constitutional right to, a speedy indictment. *MacDonald,* 456 U.S. at 8, 102 S.Ct. at 1502; *Delario,* 912 F.2d at 769. Nor is it the trial court's function to monitor and second-guess the pace of the state's preindictment activities except in the rarest of circumstances.

The only limitation on reindictment time tables for purposes of determining a possible due process violation other than substantial prejudice is delay by the prosecutor to gain a tactical advantage. The trial judge made no such specific finding in this case, and there is no evidence showing that the state delayed its new indictment to gain such a tactical advantage. Appellee seems to suggest that because one former prosecutor believed that he could not make the case against appellee, it should be summarily aborted, without regard to additional evidence that might be obtained and without regard to the professional opinion of those succeeding prosecutors charged by law with the responsibility of deciding whether to pursue the criminal charge or not. The immediate successor prosecutor assigned to appellee's case denied that she agreed with the departing prosecutor's assessment of the future of the case, and it was stipulated that she would so testify. The prosecuting supervisor felt the case to be prosecutable. And after obtaining additional evidence, the final prosecutor assigned to the case determined he had sufficient evidence to convince a jury beyond a reasonable doubt that appellee was guilty of the offense. Once he made that determination, he was duty bound to proceed.

Regardless of the former prosecutor's opinion as to the merits of the case at the time he left, the evidence showed that some time after he left, additional staff was provided to the district attorney's office and a new prosecutor was assigned to appellee's case. He reviewed a letter which had been received from an attorney whose client was a participant in the alleged drug transaction with appellee. The client was incarcerated in an Oklahoma prison, and the attorney advised the prosecutor that his client

was now willing to cooperate and testify against appellee. The prosecutor accompanied the attorney and interviewed the individual in prison. Based on the evidence he received from that individual and additional evidence he obtained from federal prosecutorial sources in the form of a drug ledger, he made the decision to seek an indictment, which was voted on by a grand jury. At the hearing before Judge Lanford, appellee sought to discredit this evidence. He asserted that the state's case was weak and unwinnable; that its witnesses were not credible; that the state previously had all this weak evidence available and should have acted sooner. In short, appellee's counsel attempted to conduct a mini-trial asking the judge to rule in advance on the strength of the state's case; the credibility of its witnesses; the manner in which it conducted its investigation; and then to summarily dismiss the case based on that limited evaluation. Without hearing the testimony of the state's witnesses or reviewing the evidence to adjudge credibility, Judge Lanford dismissed the indictment. In doing so, he specifically agreed with the former prosecutor's evaluation of the case, by directly quoting him:

> "I still agree for the record with Mr. Kelley that a thousand incredible witnesses still equal incredibility."

Notwithstanding the judge's agreement with the former prosecutor's opinion as to witness credibility fifteen months earlier, he made no specific finding that the state delayed indicting appellee to gain a tactical advantage. Nor was there any evidence brought forward at the hearing to support such a finding. During the interval preceding the new indictment, the state obtained additional evidence, evaluated it, and based on that evaluation, sought and obtained a new indictment as it was obligated to do. The determination as to when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions. *Lovasco,* 431 U.S. at 792, 97 S.Ct. at 2049. As the supreme court stated in *Lovasco,* prosecutors are under no duty to file charges until they are

satisfied they can establish the accused's guilt beyond a reasonable doubt, and due process does not permit a court to simply abort criminal prosecutions because they disagree with a prosecutor's judgment as to when to seek an indictment. *Id.* at 790, 97 S.Ct. at 2049.

We find the evidence fails to show that the appellee suffered substantial prejudice to his defense by the preindictment delay, and there is no evidence to show that the state delayed the indictment solely to gain a tactical advantage over appellee. We find the trial court erred in finding, if he did so find, that appellee's due process rights under the Fifth Amendment were violated by the preindictment delay in this case.

 With regard to whether appellee's rights to "due course of law" under art. I, Sec. 19 of the Texas Constitution, we are required to make a separate analysis under *Heitman v. State,* 815 S.W.2d 681 (Tex. Crim.App.1991). We first note that the trial court made only a general reference to this section in its conclusion of law by simply stating that the pre-trial delay is unreasonable and violates defendant's rights guaranteed under this and other sections of the Federal and State Constitutions. At the hearing, neither the trial court nor the appellee made any reference or analysis of the applicability of the due course of law provision in the Texas Constitution. Indeed, the entire hearing was directed at the alleged violation of appellee's constitutional speedy trial rights, which, as discussed, do not include this preindictment delay. However, inasmuch as the state and appellee have generally implicated it, we will address it.

*Heitman* holds that the Texas and Federal constitutional rights to due course of law and due process, respectively, are separate and distinct and must be analyzed accordingly. However, *Heitman* does not provide us with any guidelines for analyzing Texas constitutional provisions where there are no specific state court precedents. We necessarily assume that the federal court precedents applying and interpreting due process rights in relation to preindict-

ment delay can serve as useful guides to us in interpreting our Texas constitutional rights under due course of law in that regard. *See Chapman v. Evans, supra; Hull v. State, supra.* We note that while appellee provided a separate reply point for the due course of law issue, he provided virtually no distinct analysis or argument, other than referring analogously to those cases addressing the due process clause of the Federal Constitution. This is understandable because these are the only precedents available.

 After carefully analyzing the relevant State and Federal cases, we have come to the separate and independent conclusion that the standards required to show a violation of Fifth Amendment due process rights caused by preindictment delay are constitutionally sound and well reasoned. Those standards are persuasive and we find they should govern the due course of law provision of art. I, Sec. 19 of the Texas Constitution. *Spence v. State,* 795 S.W.2d 743 (Tex.Crim.App.1990); *Deeb v. State,* 815 S.W.2d 692 (Tex.Crim.App. 1991); *U.S. v. Lovasco, supra; U.S. v. Marion, supra; U.S. v. MacDonald, supra.* Therefore, applying our previous analysis of the preindictment delay, we find the trial court erred to the extent that he dismissed this indictment on the grounds that appellee's due course of law rights under the Texas Constitution were violated by the preindictment delay.

We reverse the trial court's judgment of dismissal and order the indictment reinstated.

SEARS, J., to dissent at a later date.

SEARS, Justice, dissenting.

I respectfully dissent.

The majority opinion cites *Lovasco* but then overlooks the Supreme Court's dictate that the main appellate concern should be whether or not the delay "violates those fundamental [concepts] of justice which lie at the base of our civil and political institutions." *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977) *citing Mooney v. Holohan,* 294

U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). It violates my fundamental concepts of justice to allow the State to grant itself a continuance by dismissing the indictment after the trial court denied the State's motion for continuance. It also violates my fundamental concepts of fairness to allow the State to then reindict, with no new evidence or new witnesses, and force the defendant to trial after he has lost two alibi witnesses due to the State's delay.

The Court specifically found in its conclusions of law that "the pre-trial delay is unreasonable, and violates the rights guaranteed the Defendant by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I Sections 10 and 19 of the Texas Constitution." It is well established in Texas that the appellate standard of review for a trial court's ruling is whether the Court abused it's discretion. *Sinegal v. State*, 582 S.W.2d 135, 137 (Tex. Crim.App.1979); *Moss v. State*, 790 S.W.2d 731, 732 (Tex.App.—Houston [14th Dist.] 1990, no pet.). The United States Supreme Court has applied the abuse of discretion standard when reviewing a speedy trial dismissal. *United States v. Taylor*, 487 U.S. 326, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988). On appeal, all evidence is to be viewed in the light most favorable to the trial court's ruling. *King v. State*, 831 S.W.2d 891, 893 (Tex.App.—Houston [14th Dist.] 1992, no pet.). "An appellate court must defer to the trial court's findings of fact absent a clear abuse of discretion." *Spillman v. State*, 824 S.W.2d 806, 810 (Tex.App.—Austin 1992, pet ref'd).

The trial court is the sole judge of the credibility to be given the witnesses as well as the weight to be given their testimony. *Whitten v. State*, 828 S.W.2d 817, 820 (Tex. App.—Houston [1st Dist.] 1992, pet ref'd). An appellate court does not engage in its own factual view, but decides only whether the trial judge's fact findings are supported by the record. *Id.* "If the trial court's findings of fact are supported by the record, an appellate court is not at liberty to disturb them, and ... the reviewing court may address only the question of whether the trial court improperly applied the law to the facts." *Id.*

The majority replaces the findings of the trial court with its own. It claims that the record does not support a finding of a thirty-two month delay. The trial court noted that "the defendant's case was set for trial on April 23, 1991, more than 32 months after his arrest and initial indictment." The majority held this to be an abuse of discretion, and found that the time covered by agreed resets was to be excluded from calculations for purposes of a speedy trial. However, the trial court's finding of a 32 month delay is factually correct. Pat Kelley, an assistant district attorney from September of 1983 through January of 1990, testified that the defendant was initially indicted in August of 1988. The case was dismissed on June 20, 1989. Vic Wisner, a successive assistant district attorney, took over the case in June of 1990. He had the defendant reindicted on June 22, 1990, and the case was finally set for trial on April 23, 1991. There was a ten month delay from the initial indictment to the dismissal in June of 1989. Then from June 20, 1989 to the second indictment, there was a twelve month delay. Finally, there was another ten month delay from the second indictment until trial. All these delays add up to 32 consecutive months. Even if we exclude the initial ten months from the first indictment to the dismissal, and the year delay between the dismissal and the reindictment, there still remains a ten month delay from the second indictment until trial. The Texas Court of Criminal Appeals noted in *Chapman v. Evans*, 744 S.W.2d 133, 136 (Tex.Crim.App. 1988), that the speedy trial right cannot "be quantified into a specific number of days or months."

The majority held that the ten month period of time "affords very little support for a violation of appellee's speedy trial guarantee." The majority went on to state that "without ... an improper stacking of the prior time periods, the appellee cannot seriously claim that he was denied a speedy trial during this final ten-month period." With this statement, the majority replaced the finding of the Court with its own.

The majority also held the finding of the trial court, that the defendant "asserted his right to a speedy trial," was not supported by the record. However, assistant district attorney Pat Kelley testified that the defendant made a request for a speedy trial. The majority held that: "We find the agreed numerous resets, the timing of his opposition to a continuance, the argument made by his counsel during the hearing, and his opposition to even a two-day reset, do not support the trial court's finding that he asserted his right to a speedy trial." Again, the majority is choosing to engage in its own fact finding. The testimony of Pat Kelley, an assistant district attorney who had been in charge of the case, does support the trial court's finding that the defendant asserted his right to a speedy trial. It is not the position of this court to judge the credibility of the witnesses or realign the weight to be given their testimony. It is improper for the majority to do so.

Finally, the majority states that "in our opinion the evidence presented is not sufficient to show that the [defense] witnesses' testimony was material and [their] absence therefore prejudicial." The majority held that the trial court's finding that the defendant "had suffered actual prejudice because of the delay caused by the State," was not supported by the record. Once again, the majority is inserting itself as the fact finder.

At the hearing on the speedy trial issue, Gene Boyd testified that two material defense witnesses were now lost. Mary Koonce died on December 18, 1989. A second alibi witness, Korina Zuniga, has disappeared and cannot be found. Mr. Boyd testified that they have tried all known addresses, her Texas driver's license number, her social security number and the Texas Employment Commission, and have been unable to find her. These women were alibi witnesses who were expected to testify that the appellee was not at the scene of the crime at the time and date alleged by the State. Based upon Mr. Boyd's testimony, the Court found that the defendant had suffered actual prejudice. The majority has ruled on the credibility of a witness and found that he was not credible. We simply do not have the power or authority to rule on the credibility of witnesses.

The State has not assigned error to the findings of facts and conclusions of law; therefore, I believe they are binding on this Court.[1] We are restricted to a review of whether the law was properly applied to the facts. It was noted in *Chapman (supra)*, that the "Supreme Court established a balancing test and *suggested* four factors to consider in determining whether an accused has been denied a speedy trial. The factors, though *not exclusive* are: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant resulting from the delay." *Chapman* at 136 (emphasis added)[2]. *Chapman* went on to indicate that "none of the four factors previously discussed is alone necessary or sufficient to a finding of deprivation of the right to a speedy trial," at 137.

The trial court found:

(1) The defendant had asserted his right to a speedy trial.

(2) The case had been preferentially set for June 20, 1989.

(3) H.P.D. Officer Nick Wilson had been subpoenaed, but chose to go on vacation instead of testifying.

(4) The State was not ready to go to trial on June 20, 1989 and the State had

1. For the civil presumption, see *Graham v. Pazos De la Torre*, 821 S.W.2d 162 (Tex.App.—Corpus Christi 1991, writ denied). At least one Texas appellate court has indicated that when fact findings go unchallenged in a **criminal** case, that fact is to be given some weight on appellate review. See, *Gonzales v. State*, 831 S.W.2d 347 (Tex.App.—San Antonio 1992, pet ref'd). The appellate court held that: "The record ... reflects findings of facts and conclu-

sions of law ... which support the trial court's order ... and which are not challenged by the appellant in this appeal.... We have reviewed the record and hold that the trial court was justified in [its conclusion]."

2. *Chapman* is referring to the Supreme Court case of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

not exercised due diligence to get ready for trial.

(5) On June 20, 1989 the State dismissed the case.

(6) Pat Kelley, Alice Brown, and Vic Wisner, three successive assistant district attorneys responsible for the case, were of the opinion that, as of June 20, 1989, the case was not prosecutable.

(7) After Pat Kelley left the D.A.'s office he told the defendant's attorneys about his conversation with Alice Brown and that she concurred in his decision that the defendant would not be reindicted.

(8) On June 22, 1990, the defendant was indicted again for the exact same offense—no valid reason existed for this delay.

(9) Karen Koonce was a prospective defense witness. She died on December 18, 1989. She is unavailable to the defense because of the delay caused by the State.

(10) Korina Zuniga was a prospective defense witness. She has disappeared and is unavailable to the defense because of the delay caused by the State. The defendant has exercised due diligence in attempting to find her.

(11) The defendant has suffered actual prejudice because of the delay caused by the State.

(12) No new evidence was discovered by the State between June 20, 1989 and April 23, 1991 that was not already known to the State or its agents or could not have been known through the exercise of due diligence.

Applying the trial court's finding to the law, I find that the State's actions violated the defendant's Sixth amendment right to a speedy trial. Utilizing the balancing test, the court specifically found that: (1) the delay by the State was unreasonable; (2) no valid reason existed for the delay; (3)

the defendant had asserted his right to a speedy trial; and (4) that the loss of two defense witness resulted in actual prejudice to the defendant. The *Barker* balancing test has been completely satisfied. It is only by engaging in its own fact finding that the majority can hold that the defendant's constitutional rights were not violated.

Due Process requires dismissal of an indictment if a preindictment delay: (1) caused the defendant substantial prejudice; and (2) was an intentional device by the State to gain a tactical advantage. *Spence v. State,* 795 S.W.2d 743, 749 (Tex.Crim. App.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 1339, 113 L.Ed.2d 271 (1991). The majority indicates that the defendant was not prejudiced by the delay. However, in order to establish actual prejudice for preindictment delay, the defendant need only show "some" prejudice caused by the delay. *State v. Owens,* 778 S.W.2d 135, 138 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd)[3]. Its has been held that if a material witness disappears because of the delay, prejudice is shown. *Id. citing Barker v. Wingo (supra).* The majority goes on to note that even if there was prejudice to the defendant, there was no violation of the defendant's due process rights, because nothing indicates that the delay was a tactical device intended to gain advantage over the defendant. The majority has closed its eyes to the obvious: the State was denied a continuance so it created its own. This clearly is a "intentional device intended to gain tactical advantage."

The court in *Lovasco (supra)* held that a "due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." It noted that "investigatory delay is fundamentally unlike delay undertaken ... solely 'to gain tactical advantage over the accused.'" 431 U.S. at 795, 97 S.Ct. at 2051. Tactical advantage, however, is not to be the sole inquiry. The main concern is to be the "fundamental conceptions of justice." *Id.* at 790, 97 S.Ct.

**3.** *State v. Owens* reviewed a preindictment delay under the Sixth amendment, not the Fifth amendment, because the accused had been jailed for 223 days prior to the indictment. In *Owens,* the delay was only 7 months. The prej-

udice to the accused was anxiety, and the loss of a fact witness. The facts in the case at bar are stronger than those in *Owens,* absent actual imprisonment of the defendant.

at 2049. This means that reasons other than "tactical advantage" may be considered when examining the State's reason for the preindictment delay. In this case, the trial court made a finding that the delay was intentionally caused by at least one prosecutor. Further, it found that no new evidence was uncovered from June of 1989 until April of 1991. Clearly, any delay by the State was not for investigatory purposes, but instead was because it consciously chose not to pursue the case. If such a choice causes actual harm to the accused's defense, the prosecution should not be allowed to reindict.

The Texas Court of Criminal Appeals decision in *Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App.1991), indicated that appellate courts were free to reexamine the Texas Constitution, and depart from traditional federalism when ruling on issues of State constitutional law. The appellee raised Texas Constitutional grounds at the trial court level. The State conceded that the trial court's findings addressed that issue. I find that in light of Article I of the Texas Constitution, district courts should be free to examine any and all reasons for the State's delay. In one case since *Heitman*[4], the Texas Court of Criminal appeals declined to depart from the application of federal law in speedy trial claims. However, the Court noted in *Deeb* that the appellant had offered no separate or distinct analysis of the Texas Constitution. *Deeb* at 704. The majority in *Deeb* indicated that the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutors judgment as to when to seek an indictment. *Deeb* at 705, *citing United States v. Lovasco (supra)*. However, once an indictment has been sought, further control over setting the case for trial and granting or denying continuance should lie within the sound discretion of the trial court. *See Collier v. Poe*, 732 S.W.2d 332 (Tex.Crim. App.) *appeal dismissed*, 484 U.S. 805, 108 S.Ct. 51, 98 L.Ed.2d 15 (1987); *Garcia v. State*, 537 S.W.2d 930 (Tex.Crim.App.1976).

In this case, however, the State chose to grant its own continuance. On June 14, 1989 the State filed a motion for continuance; the motion was denied. On June 16, 1989, the State filed a second motion for continuance, alleging an essential, subpoenaed State witness had "nonrefundable vacation tickets, and the witness preferred to have the case dismissed and refiled rather than 'eat' the tickets." The Court properly denied the second motion. The State then granted its own continuance by dismissing the case. However, instead of immediately refiling the case, the assistant district attorney in charge of the case was of the opinion that the case was not prosecutable. He made an intentional decision not to refile the case. No new evidence was discovered. Two defense witnesses were lost. Finally, at its convenience, the State reindicted the defendant.

The majority's opinion allows prosecutors to indict, dismiss and reindict at their convenience, in spite of the harm to defendants. "Unless we are to conclude that the Constitution imposes no constraints on the prosecutor's power to postpone the filing of formal charges to suit his own convenience, I believe we must affirm the judgment.... A contrary position 'can be tenable only if one assumes that the constitutional right to a fair hearing includes no right whatsoever to a prompt hearing.'" (Stevens, J., dissenting) in *United States v. Lovasco (supra)*, 431 U.S. at 799–800, 97 S.Ct. at 2053, *citing Moody v. Daggett*, 429 U.S. 78, 91, 97 S.Ct. 274, 281, 50 L.Ed.2d 236 (1976) (Stevens, J., dissenting).

There is no evidence to support a finding of abuse of discretion. The findings of fact of the trial court are supported by evidence, and the conclusions of law are correct. I would affirm the judgment of the trial court.

---

4. See, *Deeb v. State*, 815 S.W.2d 692 (Tex.Crim. App.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 3038, 120 L.Ed.2d 907 (1992). *Deeb* was decided on the same day as *Heitman*. The majority opinion in *Deeb* was authored by Judge White. Judge White wrote the dissenting opinion in *Heitman*.